### BUD McGREW v. THE STATE.

#### No. 3360.    Decided December 23, 1914.

#### Assault to Murder—Sufficiency of the Evidence—Charge of Court.

Where, upon trial of assault to murder, the defendant claimed self-defense, and the evidence was sufficient to sustain the conviction although conflicting, and the court submitted the issue of self-defense and properly charged the jury under the law and facts in the case, submitting the issue of aggravated assault, reasonable doubt, etc., there was no reversible error.

Appeal from the District Court of Lamar. Tried below before the Hon. Ben H. Denton.

Appeal from a conviction of assault to murder; penalty, two years imprisonment in the penitentiary.

The opinion states the case.

*Sturgeon & Ownby,* for appellant.

*C. E. Lane,* Assistant Attorney General, for the State.

PRENDERGAST, PRESIDING JUDGE.—Appellant was convicted of assault to murder J. D. Jones, and his penalty was assessed at the lowest authorized by law.

The only question is whether or not the evidence is sufficient to sustain the verdict.

Appellant was a young man twenty-five or twenty-six years old, lived with his father, Will McGrew, on his father's farm. The farms of Will McGrew and said Jones adjoined. Shortly before the assault trouble arose between Jones and Will McGrew about their dividing line. McGrew claimed some of the land in Jones' inclosure and had put up thereon several panels of wire fence. After dinner on the day of the assault, Jones took his ordinary claw-hammer and wire clippers out on his place to fix his fence. While thus out he cut the wires of the fence Will McGrew had placed in his inclosure and on land claimed by him. Appellant (and his father) that day was at work plowing in his father's field. They had just returned from dinner and were hitching up their teams to their plows to begin work. Jones called Will McGrew to him from some fifty yards distant or farther, and when McGrew got to him he told him that he had cut hell out of that wire fence which he had

placed on his land, and that if he wanted the wire to get it that day, and if he did not get it that day not to put his foot over there any other time. There was some further conversation between Jones and Will McGrew at the time. Then Jones further testified on direct examination: "I was talking, had been talking to Will McGrew and had got about through with him and Bud McGrew put in and said something; I told him none of his business and to shut his mouth, and he got mighty mad and said not to cuss him, and I did cuss him and called him a son-of-a-bitch, and Bud run around like this behind his daddy and says, 'You are another one'; well, I started around after him, and as I started around Will McGrew moved up, and as I stopped and about that time Bud McGrew reached over from behind Will McGrew with a pole about eight or ten feet long, right over nearly over Will McGrew's shoulders and struck me on the head; I sunk to my knees and Will McGrew laid me down and says, 'that will do.' . . . Bud McGrew was in something like five or six feet of me when he struck me, and Will McGrew was right in front of me and almost against me. . . . Well, now as to what Bud McGrew said, I can't say, I just remember he put in and made me mad and I told him to shut up, I don't know what Bud said that day before or in regard to the fence at the start."

On cross-examination he testified: "I don't think I cursed on the start, gentlemen, because I am not a swearing man, I don't swear only on extreme provocations, however, I may have sworn a little before it was over with. I cursed Bud and called him a son-of-a-bitch before he hit me. I suppose I still had my hammer in my hand when I was cursing Bud, I don't remember putting it down. Q. Did you follow him any after you called him a son-of-a-bitch? A. Not until he called me a son-of-a-bitch, I never started until after he called me a son-of-a-bitch. I did not at any time make any attempt to hit either Bud or Will McGrew. I stated on the examining trial in this case, 'no, I was not close enough to hit Bud and was not trying to hit Will.' Bud McGrew or Will McGrew either one was not saying anything to me until I went down into the field where they were at work and began this trouble. Q. Did you state on the examining trial in answer to this question, 'Did you try to hit Bud? No, sir; I could not get close enough to him?' A. Yes, sir. Q. Did you state on the examining trial, 'When you started after him, what did you have in your hand?' If you didn't answer, 'I had a hammer,' and is that true now? A. I don't remember whether I said I had a hammer or not positively, I am not positive about the hammer, I am just supposing I had the hammer because I don't remember of putting it down. The hammer was what I would suppose about a pound claw-hammer and the handle was twelve or fourteen inches long, something like that, an ordinary claw-hammer. Q. Did you not state on the examining trial, 'I don't know what I would have done with the hammer if I had got to him'—do you still make the statement? A. Well, I don't remember as regard to the hammer, that question as to what I would have done if I had got to him,

I don't remember about the hammer being in question, anyhow, if it was, I stated I didn't know and I still make that same statement."

On recross-examination he testified: "Q. Did you call them as you went over to where they were? A. No, I didn't call them at all, I called Will but I didn't go over where they were, they came to where I was."

The testimony of appellant and his father would have justified the jury to acquit him because of his claimed self-defense, but this was fairly and fully submitted by the court to the jury and they were told that if appellant struck Jones in self-defense, or they had a reasonable doubt of it to acquit him of assault to murder. He also submitted aggravated assault and told the jury that if they had a reasonable doubt whether or not appellant was guilty of an assault with intent to murder, or an aggravated assault, to give him the benefit of the doubt and not find him guilty of an assault with intent to murder. No complaint was made of the charge of the court at the time of the trial.

Another witness describes the stick with which appellant struck Jones as about two and one-half inches in diameter, six or seven feet long, and the heart of a postoak. Will McGrew called it a rail. Immediately after appellant struck Jones he left and tried to escape by running out of the State, but was followed several miles by an officer and caught just before he got out of the State.

The lick was on the left side of Jones' head just above his ear, cut a gash about three inches long and rendered Jones unconscious for several days. They thought he would die from the effects of it. He had physicians attending him for a long time, was in bed two or three weeks and his hearing entirely destroyed.

The parties were before the court and jury, who saw and heard them testify. There is no indication from this record that the appellant did not have a fair and impartial trial. Under the circumstances, we can not say that the evidence did not sustain the verdict, and we can not, therefore, reverse the case.

The judgment is affirmed.

*Affirmed.*